IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ANTHONY OSARINMWIAN IMADE,       §
   TDCJ-CID #1605935,                       §
                                   §
VS.                                                         §           Case No. 2:12cv266
                                     §
GREG ABBOTT, ET AL.                        §

## OPINION AND ORDER OF DISMISSAL

In this § 1983 civil rights action, plaintiff Anthony Osarinmwian Imade, proceeding *pro se* and *in forma pauperis*, claims that, while in custody of the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), defendants introduced a chemical agent into his food in retaliation for his filing grievances, and that this chemical agent burned his mouth and intestines, causing him pain and suffering in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (D.E. 1, 16, 21, 22, 28. 29, 30). Through this action, he seeks compensatory damages in the amount of $50 million dollars, plus $30 million dollars in punitive damages.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996), any prisoner action brought under federal law must be dismissed if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. See 42 U.S.C. § 1997e(c); 28 U.S.C. §§ 1915(e)(2), 1915A. Plaintiff's action is subject to screening regardless whether he prepays the entire filing fee or proceeds as a pauper. Ruiz v. United States, 160 F.3d 273, 274 (5th Cir. 1998) (per curiam); Martin v. Scott, 156 F.3d 578, 580 (5th Cir. 1998) (per

curiam), <u>cert. denied</u>, 527 U.S. 1041 (1999).  Plaintiff's *pro se* complaint must be read indulgently, <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972), and his allegations must be accepted as true, unless they are clearly irrational or wholly incredible, <u>Denton v. Hernandez</u>, 504 U.S. 25, 33 (1992).

Applying these standards, and having reviewed plaintiff's medical records, as well as expert testimony regarding plaintiff's allegations of food/chemical poisoning, (D.E. 33, 34, 46), the Court dismisses this action with prejudice for failure to state a claim and/or as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1).

## I.  Jurisdiction.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.  Upon consent of the plaintiff (D.E. 8), this action was referred to the undersigned United States magistrate judge to conduct all further proceedings, including entry of final judgment.  (D.E. 13).  <u>See</u>  28 U.S.C. § 626(c).

## II.  Procedural background.

Plaintiff is currently in the custody of Immigration authorities in Gadsden, Alabama. His complaint concerns events that allegedly occurred whiled he was in TDCJ-CID custody and housed at the Garza West Unit in Beeville, Texas.

Plaintiff filed the instant lawsuit on August 23, 2012, alleging that certain Garza West Unit officers and officials had violated his Eighth Amendment right to be free from cruel and unusual punishment when they intentionally introduced a chemical agent into his food, effectively poisoning him and causing him serious gastronomical and intestinal problems.

He alleged that defendants were motivated to poison him in retaliation for his previously filing grievances. Plaintiff named the following Garza West Unit officials and employees as defendants: (1) Warden Ernest Guterrez; (2) Major Hernandez; (3) Captain Hael; (4) Captain Farrall; (5) Lieutenant Ruiz; (6) Ms. Gonzales, food service manager; (7) Mrs. Silvas, food service manager; (8) Officer McCullen; (9) Officer Lubbock; (10) Officer Ramirez; (11) Officer Marriam; (12) Officer Ibarra; (13) Officer Boening; and (14) Officer Vega. In addition, plaintiff identified as defendants the State of Texas, Attorney General Greg Abbott, TDCJ Director Brad Livingston, and the TDCJ-CID.

On September 4, 2012, plaintiff requested that he be granted a U-1 non-immigrant VISA pursuant to 8 C.F.R. § 214.14 on the grounds that he is a victim of a crime based on defendants' alleged actions. (D.E.11). The motion was denied. (D.E. 15).

On September 20, 2012, plaintiff filed a brief in support of his original complaint, and characterized his claims to include to "malicious prosecution, poisoning, and torture ...". (D.E. 16). On September 27, 2012, plaintiff filed a pleading entitled "criminal complaint," in which he raised the same Eighth Amendment claims against defendants as raised in his original complaint. (D.E.22).

On October 9, 2012, plaintiff filed a supplement to his original complaint. (D.E. 21). This document purports to be a criminal complaint against the named defendants.

On October 18, 2012, a <u>Spears</u> hearing was conducted.[1]  Plaintiff testified that on August 9, 2010, he underwent a spinal tap at Spohn Hospital, and was then returned to the Garza West Unit.  He claims that he was supposed to receive medication at the pill window following the procedure, but Officer McCullen denied him the medication.  Plaintiff filed a grievance about the denial of medication, but it was denied with the finding that plaintiff had been "out of place," that day and, as a consequence of being out of place, he was denied pill window privileges that day.  Plaintiff claims that, after he filed the grievance about the August 9, 2010 pill window incident, defendants retaliated against him by poisoning his food.

Following the evidentiary hearing, the Office of the Attorney General ("OAG"), in its capacity as <em>Amicus Curiae</em>, was instructed to file a <u>Martinez</u> report[2] to include the following information:

(1)    A copy of plaintiff's TDCJ-CID medical records from January 2010 through December 2010; and

(2)    A copy of plaintiff's TDCJ-CID grievance records from January 10 through December 2010.

(D.E. 25).

In November 2012, plaintiff filed several additional supplements and amendments to his complaint.  (<u>See</u> D.E. 28, 29, 30).

---

[1] <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985).

[2] <u>Martinez v. Aaron</u>, 570 F.2d 317 (10th Cir. 1978); <u>Cay v. Estelle</u>, 789 F.2d 318, 323 n. 4 (5th Cir. 1986).

On February 1, 2013, the AG filed under seal its *Amicus Curiae* Martinez report (D.E. 33), and on February 4, 2013, the AG filed a supplement thereto with exhibits.  (D.E. 34).

On February 27, 2013, the AG was ordered to supplement the Martinez report with an affidavit from a licensed medical professional who had reviewed plaintiff's medical records and who could offer a medical opinion on plaintiff's claims that he had been poisoned.  (D.E. 41).

On April 15, 2013, plaintiff filed a motion for summary judgment.  (D.E. 42).  The motion was denied as premature because § 1915A screening had not yet been completed, and no defendant has yet been served in this action.  (D.E. 43).

On May 6, 2007, the AG filed its second supplement to the Martinez report with the affidavit of Jose Declet, a Physician's Assistant currently employed by the University of Texas Medical Branch ("UTMB") at the Garza Unit.  (D.E. 46).

## III.   Plaintiff's grievance and medical records.

### A.   Medical records.

Beginning in January 2010, plaintiff was seen daily in the Garza Unit infirmary for Librium administration.[3]  (See e.g. D.E. 34-8 at 14, 17, 18, 20, 2121).  Nursing notes indicate that plaintiff was "tolerating Librium regime well; no complaints voiced."  Id.  Nursing notes dated January 15, 2010 reflected that plaintiff was taking the following prescription

---

[3] Librium, (chlordiazepoxide hydrochloride), is a benzodiazephine that is used primarily to help relieve anxiety.  http://www.drugs.com/pro/librium.html.

medications, ordered by Dr. Leininger, the Garza Unit physician: (1) Citalopram for depression; (2) Enalapril Maleate for hypertension; (3) Metroprolol, a selective B-1 receptor blocker used to treat chest pains; (4) Ranitidine, used to treat stomach ulcers and gastroesophageal reflux disease ("GERD"), and (5) hydroclorothiazide, a diuretic to treat edema and fluid retention. Id. at 12.

On January 17, 2010, plaintiff was seen in the infirmary for complaints of heartburn. (D.E. 34-8 at 19).  He was prescribed an antacid (aluminum/magnesium hydroxide).  Id.  His height was 5 feet, 8 inches, and his weight was 296 lbs.  Id.

On January 19, 2010, plaintiff reported to the infirmary for complaints of dry skin and a rash in the groin area and on his feet.  (D.E. 34-8 at 15).  He was scheduled to see a provider.  Id.

On January 23, 2010, plaintiff was seen by Nurse Reyna for his skin complaints. (D.E. 34-8 at 6-11).  He was prescribed an antifungal medication for his feet and groin, and instructed on self-care treatment of his skin.  Id. at 9-10.

On February 16, 2010, plaintiff was seen in the infirmary for complaints of chest pains.  (D.E. 34-7 at 64-65; D.E. 34-8 at 1-5).  Plaintiff's weight was recorded as 284 lbs, and his blood pressure ("BP") was 137/81.  (D.E. 34-7 at 64).  Plaintiff described the pain as a sharp pain in the left, upper rib cage, breast, and shoulder.  Id. at 65.  An EKG was conducted and revealed normal sinus rhythm with rate of 70.  (D.E. 34-8 at 5).  Dr. Leininger was contacted and he prescribed Tolnaftate for plaintiff's foot fungus, as well as a topical antibiotic and ear drops.  Id.  Plaintiff was released back to his cell with no restrictions.  Id.

Throughout January and February 2010, plaintiff sent numerous sick call requests ("SCR") to the Garza Unit infirmary complaining about being "seriously depressed," "stressed out," and unable to sleep.  (See D.E. 34-6 at 6, 13-24, 33-37).

On March 9, 2010, plaintiff was seen by Mental Health Services as an outpatient at the Garza Unit.  (D.E. 34-5 at 63 through D.E. 34-6 at 1-4).  Nursing notes indicate that plaintiff had been diagnosed with depression on November 24, 2009.  (D.E. 34-5 at 63).  His other chronic medical conditions were: (1) contact dermatitis/fungal infection; (2) TB class 2; (3) esophageal reflux; (4) sleep apnea; (5) chest pain; and (6) radiculopathy cervical.  (D.E. 34-6 at 1).  He was also being treated for hypertension and asthma.  Id. Upon examination, Dr. Jamal Rafique noted that plaintiff was a 49 year old man with a previous history of depression.  Id.  Plaintiff related that he was not taking his Celexa (Citolopram) because of its gastrointestinal side effects.  Id.  Plaintiff told Dr. Rafique that he was feeling depressed because of his legal issues, and that he was experiencing anxiety and sleep problems.  Id.  Plaintiff requested that he be prescribed two medications that he had previously taken, Wellbutrin and Klonopin, for his depression and anxiety.  Id.  Dr. Rafique noted that plaintiff had no history of free world psychiatric treatment and that his symptoms did not meet the criteria for major depression.  Id.  Dr. Rafique's plan was to discontinued the Celexa and to start plaintiff on Sertraline, the generic form of Zoloft, for his depression. Id. at 3.

On March 13, 2010, plaintiff reported to the infirmary and requested that he be prescribed hydrocortisone for his rashes; he was referred to a provider.  Id. at 55-59.

7

On April 19, 2010, plaintiff was seen in the mental health care clinic for his depression.  (D.E. 34-5 at 59-62).  The mental health counselor noted that plaintiff  had no preoccupations or hallucinations and that his thought organization was logical and goal directed.  Id. at 61.  However, his affect was irritable with a negative attitude, and his mood remained depressed.  Id.  Plaintiff was scheduled for a mental health examination and continued on his medications.  Id.

On April 23, 2010, plaintiff was seen in the infirmary for his contact dermatitis/fungal infection.  (D.E. 34-7 at 49-54).  Nurse Barnett noted that plaintiff's chief complaints were chronic foot fungus and chronic acne to inner thighs.[4]  Id. at 49.  Upon examination, Nurse Barnett noted that plaintiff had cracking and scaling on both feet, and that he had been using Tolnaftate since February with no success.  Id. at 53.  Plaintiff did have a rash on both inner thighs, but there was no drainage or signs or symptoms of infection.  Id.  Plaintiff related that he had experienced these skin problems for years.  Id.  Nurse Barnett advised plaintiff to continue monitoring the symptoms but found no other treatment was required at that time. Id.  Plaintiff also complained of a sore throat, ear pain and pressure, congestion, and a headache.  Id. at 40-48.  He was given Tylenol and throat drops.  Id. at 46.

On May 3, 2010, plaintiff reported to the infirmary with a "grossly swollen" upper lip that was causing and/or accompanied by shortness of breath and facial itching. (D.E. 34-7

---

[4]In addition to the medication prescribed by Dr. Leininger in January 2010, plaintiff's medical records on April 23, 2010 noted that he had also been prescribed: (1) Albuterol inhaler as needed; (2) Amlodipine for hypertension; (3) Omeprazole for GERD; and  (4) Sertraline, the generic form of Zoloft, in place of the Citalopram.

at 39).  He was taken to the McConnell Unit emergency room where he was administered Benadryl and a steroid intravenously for his apparent allergic reaction.  (D.E. 34-3 at 54). He was returned back to the Garza Unit infirmary and prescribed Prednisone and Benadryl, and instructed to return in 3 days for follow-up care. (D.E. 34-7 at 36).

On May 11, 2010, plaintiff was seen in the Garza Unit infirmary by PA Gonzalez complaining about diarrhea for the past week, nausea, and a cough.  (D.E. 34-2 at 28-29). The diagnosis was bronchitis, and PA Gonzalez prescribed plaintiff two antibiotics, Amoxicillin and Metronidazole, as well as Bismuth Subsalicylate for diarrhea, and an antihistamine, Clorpheniramine.  Id. at 28.   He was advised to self-modify his diet and to increase hydration.  Id. at 29.

On May 14, 2010, plaintiff was interviewed by mental health services after receiving a disciplinary case for refusing to obey orders.   (D.E. 34-5 at 56-57).  The mental health provider, Robin Gandy, determined that plaintiff was capable of remaining in his current housing assignment.  Id.

On June 4, 2010, plaintiff was seen in the infirmary by Dr. Sandoval for complaints of sinus pain with pressure behind both eyes, runny nose, cough, and back pain.  (D.E. 34-2 at 26-27).  Dr. Sandoval diagnosed plaintiff with a sinus infection and back pain, and prescribed Zyrtec and Motrin.  Id. at 27.

On June 28, 2010, plaintiff was seen via CYB-R telemed video link by Dr. Michael Dome for complaints of chronic low back pain.  (D.E. 34-2 at 23-25).  Plaintiff related that he had sustained a back injury five years prior.  Id. at 23.  He denied any recent exacerbation,

and reported no bowel or bladder dysfunction.  Id.  Dr. Dome noted that plaintiff could get on and off the examination table without difficulty, had a normal gait, and could heel toe walk.  Id. at 24.  Plaintiff's right and left lateral bending was good.  Id.  Dr. Dome noted a tinea infection in the groin area.  Id.  His assessment was low back pain with limited objective evidence, and tinea infection.  Id.  He prescribed Naproxen for pain, and antifungal medications for plaintiff's infection.  Id.

On July 6, 2010, plaintiff was seen on DMS Cyber Clinic by Dr. Muldowney for his complaints of headaches, periodic fainting, and falling since 2005.  (D.E. 34-2 at 20-22). Plaintiff denied vertigo, pulsating headaches, or CNS changes.  Id. at 20.  Dr. Muldowney noted that plaintiff was morbidly obese at 278 lbs.  Id.  Plaintiff had no signs of respiratory distress, splinting or dehydration, and he spoke in a fluid manner.  Id.  His neurological tests were normal, as was his range of motion for his upper extremities.  Id. at 21.  Dr. Muldowney's assessment was that plaintiff would need to be accessed by the unit provider with more extensive examinations concerning the cause of his headaches.  Id.  He advised plaintiff on weight loss, building and stretching exercises, and encouraged him to walk 30 minutes daily.  Id.  He also advised plaintiff on his diet and recommended that he reduce his carbohydrate and sodium intake.  Id.  He refilled plaintiff's allergy medication, Loratadine. Id.

On July 12, 20011, plaintiff was seen in the mental health clinic for a routine follow-up appointment regarding his depression.  (D.E. 34-5 at 51-55).  Plaintiff told the counselor, George Fong, "not doing too good, everything wrong," but he was vague during the

interview.  Id. at 52.  He stated that he would sometimes see yellow dots or animals that he knew were not there, and at night he would hear the television "talking."  Id. at 52.  He denied any problems getting along with others.  Id.  Counselor Fong told plaintiff that his symptoms did not demonstrate that he needed medication and that the Zoloft would be discontinued.  Id.  The counselor noted a full range of affect, including smiling, and that plaintiff was not depressed.  Id. at 53.

On July 20, 2010, plaintiff was seen by Counselor Gandy for continuing complaints of depression.  (D.E. 34-5 at 47-50).  Plaintiff reported that he saw a man walking through a wall and people walking like animals.  Id. at 48.  He had a vision of a beaten man and it frightened him.  Id.  He reported that he often felt as if someone were touching him, and he heard voices questioning him.  Id.  No diagnosis was made; but plaintiff was instructed to return in 90 days.  Id. at 49.

On August 6, 2010, plaintiff reported to the Garza Unit infirmary complaining of fever, cough, and difficulty breathing.  (D.E. 34-2 at 15-16).  Upon examination, Dr. Leininger found plaintiff to be wheezing and he administered Proventil spray.  Id. at 15.  Plaintiff then had an apparent seizure, falling to the ground, crying, and then he became totally unresponsive.  Id.  Plaintiff was transported by non-911 ambulance to the local ER "for evaluation of acute atypical seizure, fever and past history of head injury."  Id.

At the Beeville ER, it was noted that plaintiff's temperature was over 101 degrees, and his BP was 156/88.  (D.E. 34-3 at 46-53, 50).  A CT scan of the brain and spinal fluid

11

analysis were conducted to rule out meningitis/encephalitis.  Id. at 48.  He was returned the Garza Unit in stable condition.  Id.

On August 7, 2010, plaintiff was seen in the infirmary following his ER visit the day before. (D.E. 34-7 at 29-30).  Nurse Barnett noted that plaintiff ambulated without assistance to the infirmary, was smiling, and stated that he felt much better.  Id. at 29.  She spoke to Dr. Leininger regarding plaintiff's lab work, the preliminary results of which showed no foreign organisms in his spinal fluid.  Id.  Plaintiff's brain CT was normal with no evidence of masses, clots or midline shifts.  Id.  His EKG showed a normal sinus rhythm with rate of 88. Id.  Dr. Leininger's treatment plan was to begin plaintiff on Dilantin, an anti-seizure medication, and to monitor the Dilantin levels every two days.  Id.  Dr. Leinger also ordered a permanent bottom bunk pass and follow-up blood work.  Id.

On August 14, 2010, plaintiff reported to the infirmary complaining of severe back pain and requesting Bengay ointment.  (D.E. 34-7 at 28-29).  LVN Lewis noted that plaintiff was already taking Naproxen and Nortriptyline for pain, and she demonstrated exercises to provide pain relief.  Id. at 28.  Plaintiff was scheduled to see a provider.  Id.

On August 19, 2010, plaintiff saw Dr. Leininger for complaints of low back pain. (D.E. 34-2 at 12).  Dr. Leininger noted that plaintiff already had a prescription for Motrin, and he instructed him on stretching exercises to perform in the bunk.  Id.

On September 17, 2010, plaintiff was seen in the infirmary for his dermatitis and skin problems.  (D.E. 34-7 at 21-27).

On September 20, 2010, plaintiff was seen by PA Declet in the Garza Unit infirmary complaining that he had "post-traumatic" headaches that were unrelieved by Pamelor, and that the NSAIDs provided only marginal relief, although he admitted that he did not have a headache at that time.  (D.E. 34-2 at 11).  Upon examination, PA Declet found no abnormality and that plaintiff's vital signs were stable.  Id. at 11.  Plaintiff's head, eyes, ears, nose, and throat were normal but for photophobia.  Id. at 11.  His neurological responses were deeply intact with depressed deep tendon responses, bilaterally.  Id.  PA Declet's impression was unresolved headaches, and his plan was to have plaintiff referred to neurology at Hospital Galveston.  Id.

On September 24, 2010, plaintiff had a CYB-R care appointment with Dr. Muldowney for his chief complaint of periodic abdominal pain and dyspepsia.  (D.E. 34-2 at 9-10).  Plaintiff reported that the prescribed Prilosec did not help, and he requested Zantec.  Id. at 9.  Plaintiff described his stomach pain as a burning mid-epigastrium, with gradual onset and no radiation.  Id.  Plaintiff did not complain of fatty food intolerance nor of vomiting.  Id.  Plaintiff denied fevers or chills.  Id.  He denied changes in his bowel movements; no diarrhea; no constipation.  Id.

Upon examination, Dr. Muldowney noted that plaintiff was morbidly obese, and that his skin color and texture was confluent without jaundice; turgor good.  (D.E. 34-2 at 9).  Plaintiff moved without symptoms or complaints of discomfort, and his range of motion was good in all areas.  Id.  Dr. Muldowney advised plaintiff that treatment of both GERD and nonerosive reflux disease ("NERD") is a stepwise approach to: (1) control symptoms; (2)

heal esophitis; and (3) prevent return or other complications.  Id.  Treatment is based on lifestyle modification and control of gastric acid secretion.  Id.  He related that antacids are the standard treatment for controlling symptoms, and he prescribed plaintiff Simethacone. Id.  Dr. Muldowney also addressed plaintiff's chronic sinus problems and obesity.  Id. at 10.

On October 14, 2010,  plaintiff reported to the infirmary complaining of eye and nose allergies, with a dry cough, and also complaining of itching on keloid scars on his chest that were enlarged.  (D.E. 34-2 at 7).  Dr. Leininger told plaintiff that nothing could be done for the keloids while he was in prison.  Id.  Plaintiff was administered a Kenalog steroid injection for his allergies, and prescribed Omeprazole for his GERD.  Id.

On October 26, 2010, plaintiff returned to the infirmary with continuing complaints of allergies.  (D.E. 34-2 at 5-6).  The assessment was perennial allergies and he was prescribed an antihistamine and eye drops.  Id. at 5.

On October 28, 2010, plaintiff reported to the infirmary complaining of an episode of food poisoning on October 12th that caused rectal bleeding.  (D.E. 34-2 at 3-4).  He related that the rectal bleeding had stopped, but complained of "jelly stools" for several days. Id. at 3.  PA Declet's impression was an upper GI pathology, and he ordered an abdominal x-ray, abdominal series, and stool evaluation.  Id.

On November 17, 2010, PA DeClet informed plaintiff that his x-rays and abdominal series were within normal limits.  (D.E. 43-2 at 1-2).  Plaintiff insisted that he had food poisoning two weeks prior and charged that PA Declet refused to test for it.  Id. at 2.

Plaintiff requested that he receive liver, kidney, insulin, and food poisoning testing.  Id.  PA DeClet noted that his medical explanations did not seem to satisfy plaintiff.  Id.

On November 21, 2010, plaintiff was seen in the infirmary for a scheduled EKG. (D.E. 34-7 at 20).  Plaintiff related that he had experienced chest pains 2 days prior, but had not come to the infirmary.  Id.  He noted that the chest pain came on after eating, and also caused him to vomit.  Id.  Plaintiff's EKG was normal.  Id.  LVN Wolfe advised plaintiff to eat slowly and chew his food thoroughly before swallowing, and to avoid lying down after eating.  Id.

On November 24, 2010, plaintiff was seen in the infirmary for sinus problems including itchy ears and eyes, and neck and shoulder pain.  (D.E. 34-7 at 11-19).  Plaintiff refused Motrin and throat drops stating that these medications had never helped him in the past, and he refused to sign the form indicating that he was refusing recommended  medical services.  Id. at 14.

On November 30, 2010, plaintiff reported to the infirmary and complained that he was suffering from vomiting, kidney problems, sinus problems, excessive heat, and head aches caused by chemicals injected into his food.  (D.E. 34-7 at 8-10).  Plaintiff's BP was 151/105, but he claimed to have been taking his BP medication.  Id. at 8.  Plaintiff's housing area was searched and blister packs of medication were found indicating that he had not taken certain of his medications, including his hydrocholrothiazide for hypertension; Metoprolol for chest pains; Amlodipine, for high blood pressure; and Enalapril, another hypertension medication.  Id. at 8-9.  Dr. Leininger was advised of plaintiff's noncompliance

15

with his medications, and with his claims about food poisoning.  Id. at 9.  The plan was to refer plaintiff to the psychology department for evaluation of his food poisoning claims.  Id.

On December 6, 2010, Counselor Gandy recommended that be plaintiff be transferred to the Jester IV mental health unit for evaluation based on his repeated complaints that security personnel were trying to poison him.  (D.E. 34-5 at 39-42).

On December 7, 2010, plaintiff was evaluated at Jester IV by Dr. Shelia Bailey.  (D.E. 34-5 at 37-38).  Plaintiff told Dr. Bailey that he was being poisoned by officers as a retaliatory act for his filing grievances against them.  Id. at 37.  He stated that as a result of the poisoning, his bowel movements now included "tissue."  Id.  Although he had denied previous mental health care treatment at his initial TDCJ-CID intake in November 2009, he now told Dr. Bailey that he had a history of both in and out patient mental health treatment in the free world for depression and anxiety.  Id.  He related that, in addition to the food poisoning, he had been "harassed, fondled, and they tried to set me up." Id. at 38.  Dr. Bailey found that his thought content revealed evidence of persecutory delusions, but no suicidal/homicidal ideation, and he was admitted for continued evaluation.  Id.  (See also D.E. 34-5 at 30-36, additional intake notes for December 7, 2010).

On December 13, 2010, plaintiff met with Dr. Bailey again for further evaluation.  (D.E. 34-5 at 13-16).  Plaintiff told Dr, Bailey that the officers wanted to kill him "because they think that he is nothing and it doesn't matter if he gets hurt or dies." Id. at 15.

### B.    Grievance records.

On August 10, 2010, plaintiff filed a Step 1 grievance, Grievance No. 2010216054, complaining that on August 9, 2010, Officer McCullen denied him his medication at the pill window. (D.E. 34-12 at 20-21).[5]  Plaintiff related that he had just come from Spohn Hospital where he underwent a  spinal tap, and that he was ordered to receive additional medication following the procedure, but it was denied.[6]  Id.

By response dated September 20, 2012, Warden Pawelek stated that an investigation revealed that plaintiff did not receive two of his prescribed medications on August 9, 2010. (D.E. 34-12 at 21).   However, the investigation indicated that plaintiff was given the opportunity twice to go to the pill window, but, rather than go to the pill window, he was found to be "out of place."  Id.  As a consequence of being found out of place, he was not permitted to go to the pill window again and he did not get his medication that day.  Id.

On October 1, 2010, plaintiff filed a Step 2 appeal of grievance No. 2010216054 arguing that had not been out of place and had wrongfully been denied his medication. (D.E. 34-12 at 18-19).[7]  He also complained that, since the August 9, 2010 incident, he had been retaliated against for filing the grievance, and that this retaliation included being striped naked in front of the chow hall in front of both civilians and prison officials, "fondled" by

---

[5] Plaintiff has also filed a copy of this grievance at D.E. 16, Ex. 1.

[6] On August 26, 2010, plaintiff filed a second grievance complaining about the August 9, 2010 pill window incident.  (D.E. 34-12 at 6-7).  That grievance was returned unprocessed with the notation: "Redundant. Refer to grievance # 2010216054."  Id. at 7.

[7] See also D.E. 16, Ex. 2, submitted by plaintiff.

officers during a search, and accused of stealing.  Id. at 18.  Plaintiff complained further that

Mr. Price had accused him of being a sexual molester.  Id. at 19.

On November 18, 2010, grievance investigator C. Lawson responded to plaintiff's

Step 2 appeal as follows:

> This office reviewed the issues presented in your grievance.  Your claim of
> sexual abuse was referred to the Region 4 Grievance Office.  Region 4 stated
> that your complaint has been noted and appropriately addressed at Step 1.
> Your complaint  was submitted to OIG for review; insufficient evidence was
> found to open an OIG investigation.  A unit investigation was completed
> regarding your allegations of sexual abuse and being stripped naked in front
> of the chow hall.  A proper strip search was conducted to ensure you had no
> other contraband.  Officer Lubbock denies your allegations that he fondled
> you.  You were stopped and pat searched due to having a biscuit in your
> pocket; this search was within policy.  You failed to provide witnesses and or
> evidence to support your claim.  No further action warranted.  Your medical
> concern was referred to the Office of Professional Standards. The Office of
> Professional Standards stated that a review of the grievance and documentation
> was completed regarding the allegation of being denied access to the pill
> window by the Correctional Office on August 9, 2010.  The appellate review
> supports the findings and response to the Step 1.  The review of the medical
> record indicates that you were transported to the local hospital for a CT scan
> and spinal fluid analysis.  You returned to the unit that same day and were seen
> in the Medical department on August 7, 2010.  The provider was notified of
> the results of the CT scan and lab work.  You were started on medications and
> restrictions.  Since then you have been referred to Hospital Galveston for
> further testing and evaluation.

(D.E. 34-12 at 19).

On November 29, 2010, plaintiff filed a Step 1 grievance, Grievance No. 2011055940,

complaining that he had been suffering from an "acid burn" down his throat to his intestines

for over 2 months, and that every time he sent an I-60 request to be seen by Dr. Leininger,

he was instead seen by a nurse, and that the nurses were preventing him from seeing Dr.

Leininger.  (D.E. 34-12 at 12-13).  Plaintiff also related that he was starting "to believe that

someone" was tampering with his insulin and food to cause his medical problems.  Id.

On January 3, 2011, the Practice Manager, Rudy Martisek, responded to plaintiff's

November grievance:

> You had [a] medical examination by a Provider on November 17, 2010, and
> he informed you [that] your abdominal x-rays were within normal limits.  He
> informed you the explanations for food poisoning were not understood.  You
> submitted your grievance on November 30, 2010 and I received it on
> December 2, 2010.  I have not been able to meet with you as you request[ed]
> since you were transferred to the Jester IV Unit on December 6, 2010 and as
> of January 3, 2011, you have not returned.  Send me an I-60 upon your return
> and I (Rudy Martisek, Medical Administrator) will meet with you if you
> desire.

(D.E. 34-12 at 13).

Plaintiff did not file a Step 2 appeal of Grievance No. 2011055940.

## IV.  Legal standard.

Regardless of whether a plaintiff has properly exhausted his administrative remedies,

his action may be dismissed for failure to state a claim upon which relief can be granted.  42

U.S.C. § 1997e(c)(2).  "To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the

violation of a right secured by the Constitution and laws of the United States, and must show

that the alleged deprivation was committed by a person acting under color of state law."

West v. Atkins, 487 U.S. 42, 48 (1988); see also Biliski v. Harborth, 55 F.3d 160, 162 (5th

Cir. 1995).  An action may be dismissed for failure to state a claim when it is clear that the

prisoner can prove no set of facts in support of his claim entitling him to relief.  Oliver v.

Scott, 276 F.3d 736, 740 (5th Cir. 2002).  The complaint must be liberally construed in favor of the prisoner and the truth of all pleaded facts must be assumed.  Id.

**V.     Analysis.**

   **A.     The Eleventh Amendment bars plaintiff's claims for money damages against the TDCJ-CID and the individual defendants in their official capacities.**

Plaintiff has sued for money damages the State of Texas and the TDCJ-CID.  In addition, he has sued for money damages Attorney General Greg Abbott and TDCJ Director Brad Livingston.  Finally, he has sued numerous Garza Unit employees and medical providers in both their official and individual capacities for money damages. (D.E. 1 at 3-4).

The Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983 for money damages.  Aguilar v. Texas Dep't of Criminal Justice, 160 F.3d 1052, 1054 (5th Cir. 1998); Farias v. Bexar County Bd. of Trustees for MHMR Servs., 925 F.2d 866, 875 n.9 (5th Cir. 1991).   Section 1983 does not waive the state's sovereign immunity, see Quern v. Jordan, 440 U.S. 332, 338 n. 7 (1979), and Texas has not consented to this suit.  See Emory v. Texas State Bd. of Med. Exam'rs, 748 F.2d 1023, 1025 (5th Cir. 1984).  Plaintiff's claims for compensatory and punitive damages against the State of Texas are barred. Similarly, because the TDCJ/TDCJ-CID is a state agency, it is immune from a suit for money damages under the Eleventh Amendment.  Lewis v. University of Texas Medical Branch at Galveston, 665 F.3d 625, 630 (5th Cir. 2011).

Plaintiff's claims for compensatory and punitive damages against the individual defendants in their official capacities are also barred because claims against state officials

20

in their official capacities are essentially claims against the State itself.[8]  Mairena v. Foti, 816

F.2d 1061, 1064 (5th Cir. 1987) (for purposes of § 1983 liability, a claim against a public

official in his or her official capacity is in effect a suit against the state or local government

he or she represents).  Thus, the  Eleventh Amendment bars plaintiff's claims against Texas,

the TDCJ/TDCJ-CID, and all of the individual defendants in their official capacities, and

therefore, these claims are dismissed.

### B.    No personal involvement by Greg Abbott or Brad Livingston.

Plaintiff has named State Attorney General Gregg Abbott and TDCJ Director Brad

Livingston as defendants.

To state a cause of action under § 1983, a plaintiff must identify defendants who were

either personally involved in the constitutional violation or whose acts are causally connected

to the constitutional violation alleged.  Woods v. Edwards, 51 F.3d 577, 583 (5th Cir. 1995);

Thompson v. Steele, 709 F.2d 381, 382 (5th Cir.), cert. denied, 464 U.S. 897 (1983).  In this

case, no where in his original complaint or numerous supplements does plaintiff suggest that

Gregg Abbott or Brad Livingston were personally involved in the alleged poisoning of his

food, or that they knew, or should have known, about his allegations against Garza Unit

officials.  Thus, it appears that plaintiff is attempting to hold these individuals liable by virtue

of their positions within the State or TDCJ as supervisors.  However, § 1983 does not create

---

[8] The Eleventh Amendment does not prohibit claims for injunctive relief against the State
or individuals in their official capacities; however, plaintiff has not sought injunctive relief in
this lawsuit.

supervisory or *respondeat superior* liability.  Oliver v. Scott, 276 F.3d 736, 742 (5th Cir. 2002).   Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under §  1983.  Id. at 742 n.6 (citing Alton v. Tex. A&M Univ., 168 F.3d 196, 200 (5th Cir. 1999).  Supervisory officials may be held liable only if they (1) affirmatively participate in acts that cause the constitutional deprivation or (2) implement unconstitutional policies that causally result in plaintiff's injury.  Oliver, 276 F.3d at 742; Thompkins v. Belt, 828 F.2d 298, 303-04 (5th Cir. 1997).  Plaintiff does not allege, let alone offer any feasible factual allegations for purposes of § 1915A screening to suggest that defendants Abbott or Livingston implemented an unconstitutional policy condoning food poisoning.  Accordingly, plaintiff claims against Abbott and Livingston in their individual capacities are dismissed.

### C.    Eight Amendment claims against Garza Unit employees in their individual capacities.

Plaintiff claims that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by poisoning his food with a chemical agent.

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  Prison officials must provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; and take reasonable measures to guarantee the safety of the inmates.   Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth

Amendment.  Hudson v. McMillian, 503 U.S. 1, 8-10 (1992); Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Such a violation occurs when a prison official is deliberately indifferent to an inmate's health and safety.  Farmer, 511 U.S. at 834.  Deliberate indifference is more than mere negligence.  Id. at 835.  To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference.  Id. at 837.

Plaintiff's own recitation of the medical care he has received, in combination with his voluminous medical records, as well as the affidavit of PA Declet, squarely refute plaintiff's allegations of repeated or intentional food poisoning in violation of the Eighth Amendment.

PA Declet is a practicing Physician's Assistant who, in addition to treating plaintiff firsthand,  has reviewed plaintiff's medical records from January 1, 2010 through March 7, 2011, to provide an opinion regarding whether plaintiff's stomach, intestinal, and bowel problems were the result of poisoning from a chemical agent.[9]  (D.E. 46-1, Declet Aff't at ¶ 3).  PA Declet notes that, well prior to his October 12, 2010 complaint of food poisoning, plaintiff had been treated for complaints of dyspepsia and GERD. (Declet Aff't at ¶ 4). Indeed, plaintiff's medications list dated January 15, 2010, reflected that plaintiff was taking Ranitidine to treat stomach ulcers and GERD.  (D.E. 34-8 at 12).  On January 17, 2010, he was seen in the infirmary for complaints of heartburn and was prescribed an antacid.  (D.E.

_____

[9] PA Declet testifies that he is not being paid, other than his normal salary, to make his affidavit.  ((Declet Aff't at ¶ 3).

34-8 at 19).  In May, plaintiff was seen in the infirmary for diarrhea and nausea, as well as a cough that was diagnosed as bronchitis.  (D.E. 34-2 at 28).  Plaintiff was counseled about modifying his diet.  Id.

On September 24, 2010, plaintiff had a CYB-R care appointment with Dr. Muldowney to address his chronic periodic abdominal pain and dyspepsia.  (D.E. 34-2 at 9-10).  Although this appointment was after the August 6, 2010 episode at the pill window, plaintiff did complain of food poisoning to Dr. Muldowney, and denied vomiting, diarrhea, or any change in bowel movements.  Id. at 9.  Dr. Muldowney's assessment was GERD and NERD, and he reaffirmed treatment with antacids and lifestyle changes.  Id.

On October 28, 2010, PA Declet saw plaintiff for his complaints of an alleged food poisoning that occurred on October 12, 2010.  (Declet Aff't at ¶ 5).  PA Declet's examination was unremarkable, so he deferred performing a rectal examination.  Id.  However, PA Declet ordered an abdominal x-ray, abdominal series, and three stool guaiac cards to test for the presence of occult blood in plaintiff's stool.  Id.  On November 2, 2010, Dr. Danzinger reviewed plaintiff's abdominal x-ray and series and determined they were within normal limits.  (Declet Aff't at ¶ 7).  There were no unusual soft tissue or calcific densities identified.  Id. The results for all three stool cards were negative for the presence of occult blood.  Id.

On November 17, 2010, PA Declet told plaintiff that his abdominal x-rays and stool cards were within normal limits.  (Declet Aff't at ¶ 8).  According to PA Declet:

> ...Imade became upset and was insistent that a chemical agent had been administered to him through his food.  We had a lengthy discussion about poisons, typical clinical presentations, and time frames for testing.  I explained

to Imade that in instances of food poisoning we would normally see symptoms from offenders who consumed the same food. We had not seen other offenders complaining of similar symptoms. Imade did not appear to be satisfied by my explanations and the test results when he left the office.

Id. at ¶ 8.

Again on December 10, 2010, plaintiff was seen in the infirmary for complaints of burning sensations after eating meals, and he attributed his symptoms to chemical agents being placed in his food. (Declet Aff't at ¶ 9). Plaintiff's symptoms were consistent with GERD, and he was given a new prescription for Zantac. Id. Later that month, plaintiff was transferred to the Jester IV psychiatric unit "to receive treatment [for] delusions of being poisoned by a chemical agent placed in his food." Id.

On March 8, 2011, Hussein Gadban, M.A., Licensed Professional Counselor, conducted a psychiatric evaluation of plaintiff. (Declet Aff't at ¶ 10). Mr. Gadban reported that: "'Imade appears to somatize his symptoms and converts his stressors into actual physical symptoms, mainly abdominal.'" Id. Mr. Gadban characterized plaintiff's paranoia regarding food poisoning as his inability to accept responsibility for his symptoms, and instead, blame others, consistent with a personality disorder as opposed to a delusional disorder. Id.

PA Declet concludes that plaintiff's symptoms as noted in his medical records were not consistent with food poisoning from a chemical agent. (Declet Aff't at ¶ 11). He notes:

First, there were no observed signs consistent with food poisoning such as nausea. vomiting, and diarrhea. Second, the offenders who consumed the

25

same food as Imade did not complain of similar symptoms.[10]  Third, the stool guaiac cards tested negative for the presence of occult blood in Imade's stool. Fourth, the x-ray and abdominal series results were within normal limits. Finally, the acute symptoms of food poisoning do not typically last for many years.

(Declet Aff't at ¶ 11).

In Declet's opinion, plaintiff is confusing the symptoms of GERD with food poisoning from a chemical agent.  (Declet Aff't at ¶ 12).  The gastric symptoms are similar, and Mr. Gadhan found that plaintiff's personality disorder and failure to take responsibility for his own actions could cause him to blame others and to feel victimized.  Id.  Moreover, plaintiff's voluminous records demonstrate that plaintiff is very cognizant of his physical condition and does not hesitate in seeking medical attention.

In his complaint, plaintiff alleged that it was the August 6, 2010 pill window incident that caused officers to retaliate against him, but he did not complain of food poisoning until October 12, 2010.   Between August and October 2010, plaintiff was repeatedly seen by medical personnel, but he did not complain of poisoning during that time.  After complaining of poisoning, his complaints escalated to inappropriate sexual abuse and torture, but plaintiff never made these allegations to his medical care providers, despite his frequent visits to the infirmary.  Upon his arrival at the Jester IV Unit on December 7, 2010, he continued to complain that the Garza Unit defendants were poisoning his food in retaliation for his filing

---

[10] The fact that other offenders did not suffer food poisoning symptoms does not necessarily refute plaintiff's allegations that he was singled out for food poisoning, but does establish that there was no food poisoning outbreak at that specific time.

grievance, but by December 13, 2010, plaintiff no longer characterized their actions as retaliatory, but instead claimed that they were trying to kill him simply because they could get away with it and no one would care. (D.E. 34-5 at 15). The medical health experts diagnosed him initially with a delusion disorder with persecutory undertones, and in May 2011, plaintiff's thought processes were found to be "paranoid." Regardless of the exact diagnosis, the evidence establishes that plaintiff was not poisoned but rather, he somatized his symptoms. (Declet Aff't at ¶12). Plaintiff's allegations fail to state a cognizable Eighth Amendment claim.

### D. Retaliation.

Plaintiff contends that he was poisoned by Garza Unit staff in retaliation for his exercising his right to file grievances against security staff.

To state a valid § 1983 claim for retaliation, "a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999) (citing McDonald v. Stewart, 132 F.3d 225, 231 (5th Cir. 1998). An inmate must allege more than his personal belief that he is the victim of retaliation. Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997) (citation omitted). Mere conclusory allegations of retaliation will not withstand a summary judgment challenge. Woods, 60 F.3d at 1166.

The purpose of allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights. Morris v. Powell, 449

F.3d 682, 686 (5th Cir. 2006).  However, some acts, even though they may be motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights.  Id.  Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim.  Id.  For example, a job transfer from the commissary to the kitchen might be *de minimis*, while a transfer to a more dangerous unit might constitute an adverse retaliatory act.  Id. at 687.

In the context of an inmate who alleges that the retaliatory motive stemmed from his filing grievances, the mere fact that the alleged retaliatory act occurred with temporal proximity is insufficient to establish the "but for" retaliatory intent element.  See Reeves v. Wood, 206 Fed. Appx. 368, 369 (5th Cir. 2006) (finding temporal proximity is insufficient to establish retaliatory motive).  The mere fact that one incident precedes another is not proof of a causal connection.  Lucio v. Crites, 2010 WL 1727122 (S.D. Tex. Apr. 28, 2010).  An inmate must demonstrate more than his personal belief that he is being retaliated against.  See Jones, 188 F.3d at 324-25.

Here, plaintiff's allegations do not state a claim of retaliation because he fails to establish that he suffered an injury motivated by retaliation.  Although plaintiff *contends* he was poisoned, the objective medical evidence and affidavit of PA Declet refute plaintiff's claims that he was the victim of food poisoning.  Moreover, mental health care providers at the Jester IV Unit diagnosed plaintiff with "Delusional Disorder, Persecutory Type" based on his behavior at the Garza Unit and his continuing complaints and belief that his food was being poisoned.  (D.E. 34-5 at 38; D.E. 34-4 at 53-57).  Because plaintiff was not poisoned

by staff, there is no retaliatory act.  Thus, plaintiff fails to state a cognizable claim of retaliation against any defendant.

## V.   Conclusion.

For the reasons stated above, it is ORDERED that:

(1)     Plaintiff's claims for money damages against the State of Texas, the TDCJ/TDCJ-CID, as well as all named defendants in their official capacities are dismissed as barred by the Eleventh Amendment;

(2)     Plaintiff's claims against Greg Abbott and Brad Livingston in their individual capacities are dismissed for failure to state a claim and/or as frivolous because plaintiff failed to establish personal involvement for purposes of § 1983 liability;

(3)     Plaintiff's voluminous medical records, as well as the affidavit of PA Declet, clearly rebut his allegations that he was poisoned by Garza Unit staff in violation of the Eighth Amendment, and therefore, plaintiff's § 1983 claims for damages against the named defendants are dismissed with prejudice for failure to state a claim and/or as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1);

(4)     Plaintiff's retaliation claims are dismissed for failure to state a claim and/or as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1); and

(5)     The dismissal of this case is a "strike" for frivolous filing as described by 28 U.S.C. § 1915(g), and the Clerk shall provide copies of this dismissal order to the plaintiff, to the TDCJ–Office of the General Counsel, P.O. Box 13084, Austin, Texas, 78711, Fax

Number (512) 936-2159, and to the District Clerk for the Eastern District of Texas, Tyler

Division, 211 West Ferguson, Tyler Texas, 75702, Attention: Betty Parker.

ORDERED this 4th day of June, 2013.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE